UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 22, 2016
```

-------------------------------------------------------------X
                                                             :
YOLANDA D. ESCOLASTICO,                                      :
                                                             :
                                      Plaintiff,             :        14-cv-5277 (KBF)
                                                             :
                  -v-                                        :        OPINION & ORDER
                                                             :
COMMISSIONER OF SOCIAL SECURITY,                             :
                                                             :
                                      Defendant.             :
-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Plaintiff Yolanda D. Escolastico seeks review of the decision by defendant
Commissioner of Social Security finding that she was not entitled to disability
insurance benefits under Title II of the Social Security Act.

This matter relates to plaintiff's diagnosis of relapsing remitting multiple
sclerosis. (AR 27.) She was diagnosed in 2008, but continued to work for several
years. (AR 28.) The alleged onset date of her disability is November 8, 2011, the
day she left her most recent job. (AR 27.)

Plaintiff applied for disability insurance benefits in late 2011. (AR 79-80.)
After her initial application was denied by a letter dated February 27, 2012 (AR 81),
she requested a hearing before an administrative law judge ("ALJ"). (AR 87.) The
ALJ conducted a hearing on August 10, 2012; he determined that plaintiff was not
disabled. (AR 36-78; 19-35.) The Appeals Council denied plaintiff's request for
review on March 25, 2013. (AR 1-9.) This suit followed. (ECF No. 1.)

Before the Court are the parties' cross-motions for judgment on the pleadings. (ECF Nos. 21, 28.)  As set forth below, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this action is remanded to the Commissioner for further proceedings.

I.   BACKGROUND

A.   Plaintiff's History

Plaintiff is a 34 year old woman residing in Manhattan; she was 31 at the time of the ALJ decision at issue.  (AR 79.)  She has a master's degree and, starting in approximately 2003, she worked as an assistant to the dean of Touro College. (AR 41-43, 55.)  Her work mostly consisted of sitting at a computer.  (AR 43.)

In 2008, plaintiff started to suffer a series of fainting episodes, interminable headaches, numbness and cramping on her right side, and an "electric current sensation."  (AR 272, 315.)  She was admitted to NYU Medical Center, where an MRI of her cervical spine detected abnormal lesions and demyelination.  (Id.)  Based on these results, plaintiff was diagnosed with relapsing-remitting multiple sclerosis ("MS").  (AR 43, 309.)  Her first in-hospital treatments were intravenous steroids, which were followed by oral steroids with plans to taper off following her discharge. (AR 338, 346.)  Plaintiff began taking Copaxone, a drug used to treat and prevent relapses of MS.  (AR 387.)

Plaintiff continued to work at Touro College after her diagnosis.  (AR 43.) According to her testimony, her boss was worried about her and gave her easier tasks as her abilities faltered.  (AR 43-44.)  He also, according to plaintiff's

testimony, paid for her to commute by cabs because she was not able to travel to work on her own.  (AR 51.)  Plaintiff further testified that despite her employer's sympathy, the difficulty of the job continued to rise for her, both physically and cognitively, as she had difficulty both walking and remembering messages and how to do her job without confusion.  (AR 55-56.)

In February 2011, plaintiff sought follow-up care from Dr. Ilya Kister at NYU's MS Care Center.  (AR 236.)  She reported that she was still taking Copaxone without side effects, but that she had been suffering from severe pain in her lower extremities that had been ongoing for several months and was worsening.  (Id.)  She also reported difficulty finding words and with her memory.  (Id.)  Dr. Kister's neurologic exam on that day revealed no apparent cognitive impairment.  (Id.)

In May 2011, plaintiff visited Dr. Kenneth Redcross at Manhattan Physician's Group.  (AR 494-95.)  Dr. Redcross is one of plaintiff's primary care providers; she had visited him at least once before, in January 2011, for a pregnancy test, which was negative.  (AR 496-97.)  During the May visit, plaintiff told Dr. Redcross that her MS symptoms were moderately severe and were aggravated by stress.  (AR 494.)

In August 2011, plaintiff returned to Dr. Kister at NYU.  (AR 389.)  During this visit, she reported that she was seven weeks pregnant, and had stopped taking Copaxone at the end of July.  (Id.)  Dr. Kister advised plaintiff to remain off Copaxone for the duration of her pregnancy, and possibly beyond.  (AR 391.)  Plaintiff also described fatigue, pain and numbness in her extremities and back

3

which forced her to shift positions while sitting, and memory problems that she believed might be affecting her job performance.  (AR 389.)  Dr. Kister's neurological exam of plaintiff did not indicate any disorientation or abnormal affect, and the notes from the visit state that plaintiff was not using a cane to walk. (AR 389-90.)

In early September, plaintiff returned to Dr. Redcross at Manhattan Physician's Group.  (AR 492.)  The notes from that visit indicate that plaintiff's MS was stable and that she had been fatigued since becoming pregnant.  (Id.)

On November 8, 2011, plaintiff left her job at Touro College.  (AR 27.)  At her hearing before the ALJ, she explained that she left because she was having "difficulty walking" and "felt very ashamed because [she] was forgetting a lot."  (AR 44.)  She further described "a lot of confusion," including mistakes with relaying messages to her boss.  (AR 55-56.)

At the end of November, plaintiff received prenatal care from Dr. Kok-Min Kyan.  (AR 490.)

On December 8, 2011, plaintiff again visited Dr. Kister at NYU.  (AR 393.) She reported cramping and abnormal feeling in her extremities, "which ha[d] been there since 2008."  (Id.)  Dr. Kister noted that plaintiff was expecting a daughter and was due April 1, 2012.  (Id.)  He also noted that plaintiff was taking disability from work.  (Id.)  Dr. Kister reported that the results of plaintiff's neurological exam were normal.  (Id.)

On December 26, 2011, plaintiff visited NYU Hospital Center because she had started to have intermittent abdominal pain.  (AR 287.)  She was discharged,

but five days later was back in the same hospital, undergoing an emergency cesarean section after presenting with pre-term labor. (AR 285-302.) Plaintiff's daughter was in a Neonatal Intensive Care Unit ("NICU") until May 2012, first at NYU and, after March 16, at Blythedale Children's Hospital in Westchester. (AR 45-45.)

Around the time plaintiff gave birth to her daughter, plaintiff's ex-husband left his job as a security guard and moved back in with her. (AR 66.) Although the couple had divorced in 2009, he was the daughter's father, and he testified before the ALJ that he stopped working because he "wanted to take care of [his] ex-wife." (AR 65-66.) As of that hearing, he and plaintiff were still living together, and he took on most of the chores around the house, including caring for the child and helping plaintiff get dressed and walk. (AR 68-69.)

In January 2012 plaintiff returned to Dr. Kister. (AR 397.) He again recorded her as having a normal neurological exam and not using a cane for assistance. (AR 398-99.) Dr. Kister noted plaintiff's continued complaints of pain and suggested acupuncture. (AR 399.)

On February 6, plaintiff visited Dr. Aurelio Salon after being referred for an examination by New York's Division of Disability Determination. (AR 354.) Dr. Salon's report indicated that plaintiff could do light cooking and shopping, but that her ex-husband did the cleaning and helped her bathe and dress. (AR 355.) Dr. Salon also opined that plaintiff's cane was "medically necessary for balance purposes." (Id.) Dr. Salon wrote that the examination resulted in "no objective

findings to support the fact that the claimant would be restricted in her ability to sit," but that her MS would restrict "her ability to stand for long periods of time and her capacity to climb, push, pull, or carry heavy objects."  (AR 357.)

A week later, plaintiff was seen by Nurse Practitioner Carrie Lyn Sammarco to complete disability paperwork.  (AR 402.)  Plaintiff reported "right side cramping and low back pain and difficulty concentrating," and reported that she was receiving physical therapy twice weekly.  (Id.)  NP Sammarco conducted a neurological exam, which had normal results, and reported that plaintiff had, but did not use, a cane. (AR 403.)  NP Sammarco then filled out a form for the Division of Disability Determination at the New York State Office of Temporary and Disability Assistance on which she reported, among other things, that plaintiff's mental status was normal and that there was no significant interference with communication.  (AR 361.)

Later in February 2012, plaintiff returned to Dr. Redcross.  (AR 488.)  She reported stress stemming from her daughter's continued stay in the NICU, which was then in its second month, and occasional weakness and fever.  (Id.)  Dr. Redcross's exam did not indicate any abnormalities in her physical or psychiatric well-being.  (AR 489.)  Plaintiff also saw Dr. Redcross in mid-March, when she reported chronic fatigue and requested lab work.  (AR 485.)  Dr. Redcross's exam again had fully normal results.  (AR 486.)

On March 20, plaintiff was again seen by Dr. Kister.  (AR 405.)  He noted that she now had multiple symptoms and a worsening gait, and that she used a

6

cane.  (AR 406.)  Dr. Kister's exam notes suggested that her worsening symptoms were "likely at least in part … due to severe stress of her daughter's illness," and also noted the "[p]ossibility of MS worsening as well in the post-delivery period." (Id.)  His plan for patient's care involved a new MRI of her brain and spinal cord, IV steroids, and restarting Copaxone.  (Id.)

Plaintiff's next visit to Manhattan Physician's Group, on March 30, 2012, was not with Dr. Redcross, but instead with Dr. Ana Guerra.  (AR 483.)  Plaintiff reported she was doing better and Dr. Guerra ordered a brain and spine MRI.  (Id.)

In May plaintiff returned to Dr. Kister for another follow-up.  (AR 409.)  Dr, Kister's notes indicate that her recent brain MRI indicated no new lesions, but that the MRI of her spinal cord had identified a lesion that previously had not been definitely noted.  (AR 410.)  Plaintiff also visited Dr. Kister's office in June; that visit resulted in no changed impressions or diagnoses.  (AR 414-15.)

On August 4, 2012, Dr. Kister wrote a letter that stated that plaintiff had been his patient since 2008 and that she had "accumulated significant disability due to her MS, especially with regard to her cognition and ambulatory abilities (presently needs to use a cane to walk)."  (AR 501.)  The letter further stated Dr. Kister's opinion that "she is unable to return to her work duties at present."  (Id.)

Three days later, on August 7, 2012, Dr. Guerra completed a multiple sclerosis "Residual Functional Capacity Questionnaire."  (AR 502.)  Dr. Guerra indicated that plaintiff suffered sensory loss that interfered with her locomotion and use of fingers, hands, and arms, experienced excessive reproducible fatigue, and was

constantly subject to symptoms sever enough to interfere with her attention and concentration.  (AR 503-04.)  Dr. Guerra expressed her view that plaintiff could only walk one city block without resting, could only stand for 15 minutes without resting, and could neither sit nor stand for more than two hours in an 8-hour workday.  (AR 504-05.)  The questionnaire also reported that plaintiff would "very often" have to take unscheduled "hours" long breaks during her work day, and estimated that were she to work, plaintiff would be absent more than four days per month (the highest category on the form).  (AR 505-07.)

B.  <u>Disability Determinations</u>

Plaintiff filed her applications for disability insurance benefits and supplemental security income on December 30, 2011.  (AR 137-50.)  These applications identified November 8, 2011 as the date on which she became unable to work, and thus the alleged onset date of her disability.  (AR 137, 141.)  The Social Security Administration disapproved her claim on February 27, 2012, after concluding that although she had been "unable to perform certain kinds of work" even before she left her job the previous November, she "could have performed certain sedentary work."  (AR 85.)  In March plaintiff requested a hearing before an ALJ.  (AR 87.)

The hearing was held before ALJ Mark Solomon on August 10, 2012.  (AR 36.)  Plaintiff was accompanied by her attorney, and she and her ex-husband both testified.  (AR 38.)  Plaintiff testified in a low voice that made it difficult for the ALJ to understand her responses.  (AR 41.)  She described her work history, the

8

complications around the premature birth of her daughter, and her ex-husband's return to help her. (AR 42-48.) She further testified that she needed a cane and could not travel by herself using the bus or subway. (AR 50-51.) Her application for a home health aide from the city had been approved, but the aide had not yet begun and plaintiff testified that she was not able to take care of her daughter by herself. (AR 52.)

Plaintiff testified that she found it "very uncomfortable and painful to be sitting at one position," and that she felt worthless and depressed, although she was not seeing a psychiatrist or a psychologist. (AR 52-53.) She was afraid to go out because of how frequently she became disoriented and forgetful, although she was aware that her doctors' testing of her cognition was generally normal. (AR 54.) In response to questioning by her attorney, plaintiff further testified that she lost track of her thoughts "[a]ll the time," and couldn't avoid forgetting things and getting confused at work. (AR 54-55.) She also reported that she left work early or called in sick "probably five to six days per month." (AR 63.) Plaintiff reported that she was currently feeling an electric current running through her right side and pain in her back and neck, and that since she had developed her low voice she was unable to speak louder. (AR 58.)

Plaintiff's husband also testified, explaining that he had moved back in with plaintiff and left his job as a security guard to take care of her. He described the assistance she needed, such as cooking, helping her walk and dress herself, and

taking care of their daughter.  (AR 68-69.)  He also described plaintiff's trouble finding words and with her memory.  (AR 72.)

ALJ Solomon denied plaintiff's application in a decision dated October 3, 2012.  (AR 25-32.)  He concluded that she had "the residual functional capacity to perform the full range of sedentary work."  (AR 28.)  Although he did agree that plaintiff suffered from "medically determinable impairments [which] could reasonably be expected to cause some degree of the alleged symptoms," he further found her "statements concerning the intensity, persistence and limiting effects of these symptoms cannot reasonably be accepted as being consistent with the objecting medical evidence."  (AR 30.)

The ALJ based this conclusion on his review of the submitted medical records, which he recounted in his decision.  He noted that plaintiff "has a history of MS and mild lumbar abnormalities," but "was able to continue to work at her job as secretary and administrative assistant despite her diagnosis until she became pregnant in 2011."  (Id.)  The decision concluded that "the objective testing contradicted [plaintiff's] allegations of significant cognitive defects and dexterity issues, and limitations on walking," and furthermore "did not support her testimony that her former employer made special work accommodations for her."  (Id.)

The decision specifically discussed the appropriate weight given to the opinions of Dr. Guerra, Dr. Kister, Dr. Salon, and NP Sammarco.  ALJ Solomon assigned Dr. Guerra's opinions, expressed in the August 2012 questionnaire, "little weight … because the specialists treating [plaintiff] for MS did not find such

limitations and the well-documented medical evidence at NYU Medical Center …
[and] Manhattan Physician's Group do not support Dr. Guerra's limitations." (AR
31.) He similarly gave Dr. Kister's opinion that plaintiff could not return to work
only "partial weight," "because all cognitive testing was fully within normal limits"
and the "alleged problems communicating are not documented in any records." (Id.)

In contrast, the ALJ assigned "substantial weight to the nurse practitioner's
opinion [because] even though she is not an acceptable medical source, she is a
treating source and her opinion is consistent with the objective findings within the
treatment notes from that facility." (Id.) Similarly, he also "assign[ed] significant
weight to Dr. Salon's opinion because it is consistent with the medical records and a
sedentary RFC." (Id.)

As a result of the preceding, ALJ Solomon concluded that plaintiff was able
"to perform the full range of sedentary work in an environment free from
unprotected heights and hazardous materials." (Id.) Her claim for disability
insurance benefits was therefore denied

Plaintiff requested review of ALJ Solomon's decision from the SSA Appeals
Council in December early December 2012. (AR 18.) The Council denied review in
April 2014. (AR 1.) This action followed on June 30, 2014. (ECF No. 1.) Plaintiff
moved for judgment on the pleadings in May 2015, and defendant cross-moved in
July. (ECF Nos. 21 & 28.) The case was reassigned to the undersigned November
3, 2015.

II.     APPLICABLE LEGAL PRINCIPLES

        A.      Judgment on the Pleadings

        "After the pleadings are closed—but early enough not to delay trial—a party

may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same

standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R.

Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First

Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore,

"[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id.

(quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

        B.      The Disability Standard

        The Commissioner will find a claimant disabled under the Act if he or she

demonstrates an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's

impairment must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."

Id. § 423(d)(2)(A). The disability must be "demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ["Appendix 1"]. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ["RFC"] to perform her past work.
>
> Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998). The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C.   Review of the ALJ's Judgment

The Commissioner's and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial

13

evidence.  When these two conditions are met, the Commissioner's decision is final. See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).  While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."

14

(citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ

decision where substantial evidence supported both sides).

     D.     The Treating Physician Rule

     "[T]he treating physician rule generally requires deference to the medical

opinion of a claimant's treating physician," although an ALJ need not afford

controlling weight to a treating physician's opinion that is "not consistent with other

substantial evidence in the record, such as the opinions of other medical experts."

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted). An ALJ

who does not accord controlling weight to the medical opinion of a treating

physician must consider various factors, including "(i) the frequency of examination

and the length, nature and extent of the treatment relationship; (ii) the evidence in

support of the treating physician's opinion; (iii) the consistency of the opinion with

the record as a whole; [and] (iv) whether the opinion is from a specialist." Id. (citing

20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must

"comprehensively set forth reasons for the weight assigned to a treating physician's

opinion." Id. at 33.

     Although the ALJ will consider a treating source's opinion as to whether a

claimant is disabled or able to work, the final responsibility for deciding those

issues is reserved to the Commissioner, and the treating source's opinion on them is

not given "any special significance." 20 C.F.R. § 404.1527(d)(e); see also SSR 96-5p,

1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.

1999). When a finding is reserved to the Commissioner, "the Social Security

Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence.  See Richardson v. Perales, 402 U.S. 389, 399 (1971).

E.    Onset of Disability

The date on which a disability is alleged to have begun is an important determinant of both eligibility for disability benefits and the extent of those benefits.  The onset date of disability is the first date on which a claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Social Security Ruling 83-20 provides guidance as to the policy goals related to establishing the onset date of a disability and the relevant evidence to be considered when making that determination.  When an alleged disability is of a nontraumatic origin, as in this case, a wide range of evidence, including the applicant's allegations, work history, and medical evidence, should be considered. The Ruling warns that "[w]ith slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling."  Accordingly, an alleged onset date of disability may not be rejected solely because the available medical evidence does not establish a precise date.  See Maisch v. Heckler, 606 F. Supp. 982, 990-91 (S.D.N.Y. 1985).

16

F.    The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996))).

III.   DISCUSSION

In this case the ALJ improperly discounted the opinions of plaintiff's treating physician in violation of the treating physician rule and failed to develop the record to address any gaps in the treating physician's records.[1]

---

[1] In light of the Court's determination that the ALJ violated the treating physician rule and did not carry out his duty to develop the record, the Court does not consider plaintiff's other challenges to the ALJ's decision.  On remand, the ALJ may revisit other aspects of his decision on a full record as appropriate.

ALJ Solomon gave only "little" and "partial" weight to the medical opinions of Dr. Guerra and Dr. Kister, the physicians who treated plaintiff and had the most extensive experience with her.  (AR 31.)  Under the treating physician rule, ALJ Solomon was obligated to give these opinions controlling weight if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2).  Because he concluded that the objective medical evidence stemming from plaintiff's examinations and office visits did not support the opinions, he was not required to give the opinions controlling weight.

However, even where the opinions of treating physicians are not due controlling weight, regulations require that ALJs provide a more thorough explanation of the appropriate weight than was evidenced here.  Specifically, determining how reliable Dr. Guerra's and Dr. Kister's opinions were required consideration of "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

ALJ Solomon wrote that one of the reasons he gave "little weight to Dr. Guerra's opinion [was] because the specialists treating [plaintiff] for MS did not find such limitations."  (AR 31.)  The ALJ did not identify which specialists this

18

statement referred to.  Dr. Kister was the MS specialist with by far the most extensive experience treating plaintiff.  His opinion letter, although less detailed than Dr. Guerra's residual functional capacity questionnaire (AR 502), did in fact "find such limitations."  Specifically, Dr. Kister's letter of August 5, 2012 explained that plaintiff had "accumulated significant disability due to her MS, especially with regard to her cognition and ambulatory abilities."  (AR 501.)  The supposed conflict between Dr. Guerra and "the specialists treating [plaintiff] for MS" fails to appear in the record.

Furthermore, Dr. Kister's status as an MS specialist would normally be expected to weigh in favor of granting his opinions about plaintiff's MS-related disability greater weight.  As ALJ Solomon's decision discussed, there was no question that plaintiff has MS and that it is a severe impairment; the relevant question is the true intensity and severity of her disability.  Without a recognition that Dr. Kister, who identified a "significant disability ... especially with regard to [plaintiff's] cognition and ambulatory abilities" (AR 501), is a specialist in MS, the determination that his medical opinion was due only "partial weight" is incomplete.

For neither Dr. Guerra nor Dr. Kister does the ALJ's decision consider the frequency of examination and the length, nature and extent of the treatment relationship.  Dr. Kister treated plaintiff's MS for several years and conducted many office visits and examinations.  Dr. Guerra appears to have only examined plaintiff once, but her colleague at Manhattan Physician's Group, Dr. Redcross, met with and treated plaintiff several times before that visit.  ALJ Solomon did not

discuss the length or depth of the doctor/patient relationship that existed between the medical sources and plaintiff, despite the Second Circuit's identification of this factor as an important one for determining the proper weight to give treating physicians' opinions.

By the same token, the ALJ's decision also did not discuss the fact that NP Sammarco and Dr. Salon, the medical sources to which he assigned "substantial" and "significant" weight (AR 31), each only examined plaintiff once. The ALJ is, of course, not bound to accord these sources less weight solely because their experiences with plaintiff were limited, but there is no indication that this factor was considered at all.

Finally, at two points the ALJ appears to have put the cart before the horse. The decision explains that the opinion Dr. Salon reached after plaintiff's consultive internal medical examination is due "significant weight … because it is consistent with the medical records and a sedentary RFC." (AR 31.) Although an opinion's consistency with the rest of the medical evidence available in the record is of course an important determinant of the weight it is properly due, the process of assigning weight to medical sources' opinions is intended to be a step toward establishing the proper RFC. It is backwards to justify assigning an opinion great weight because it is consistent with the conclusion that is supposed to be based on the totality of the evidence.

Similarly, when discussing the credibility of plaintiff's subjective reported disability, he noted that it was "contradicted" by some of the objective testing in the

records.  (AR 30.)  From this, he "conclude[d] that [her] allegations of her inability

to function in the workplace are only credible to the degree that they are consistent

with the above RFC assessment."  (AR 31.)  Making credibility determinations is

one of the crucial roles of the ALJ, and they are properly due great deference from a

reviewing court.  <u>Calabrese v. Astrue</u>, 358 F. App'x 274, 277 (2d Cir. 2009).  But

again, the ALJ's ultimate conclusion of plaintiff's residual capacity should take into

account the credibility of her testimony about her subjective experiences, rather

than the credibility of that testimony turning on its consistency with an already-

reached conclusion.

The above discussion does not require that plaintiff be found disabled on

remand.  In particular, the Court notes that the strongest medical evidence of

plaintiff's disability is contained in Dr. Kister's August 5, 2012 letter and Dr.

Guerra's August 7, 2012 Residual Functional Capacity Questionnaire, both of which

offered contemporary assessments of plaintiff's condition.  Such evidence may be of

limited value to determining the date of onset of disability, if the process reaches

that point on remand.  Although ALJ Solomon's determination that plaintiff is not

disabled precluded the need for any analysis of the date of onset, the Court notes

that the evidence in the record clearly indicates that plaintiff's medical

circumstances shifted over time.  On remand, the ALJ may seek to understand how

and when plaintiff's impairment worsened over time.  The evidence pertaining to

the date of onset, as well as the evidence of plaintiff's disability more generally, may

need to be further supplemented in order to reach an accurate conclusion regarding plaintiff's disability.  The Court takes no position on that final question at this time.

IV.     CONCLUSION

Accordingly, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this case is remanded to the Commissioner for further proceedings. On remand, the ALJ shall issue a new decision consistent with this Opinion & Order. The ALJ may reconsider any other aspect of his decision as appropriate on a complete record.

The Clerk of Court is directed to terminate the motions at ECF Nos. 21 and 28, to terminate this action, and to remand this action to the Commissioner for further proceedings consistent with this Opinion & Order.

SO ORDERED.

Dated:     New York, New York
           February 22, 2016

_____
           KATHERINE B. FORREST
           United States District Judge